(28 Misc. Rep. 13.)

PEOPLE ex rel. MANHATTAN RY. CO. v. BARKER et al.

(Supreme Court, Special Term, New York County. June, 1899.)

1. TAXATION—ASSESSMENT—FINDINGS BY REFEREE.
    Under Laws 1896, c. 908, § 253, providing that, where the validity of a tax assessment is disputed, it may be submitted to a referee, and his report shall constitute part of the proceedings on which the court may determine its validity or invalidity, the findings are not conclusive on the court.

2. SAME—PAYMENTS BY RAILROAD COMPANY FOR EASEMENTS.
    Where an elevated railroad company makes payments to adjoining landowners for the purpose of extinguishing easements which interfere with the operation of the road, and affect the value of the right of way and realty, in assessing the property of the company for taxation the value of the land must be taken as enhanced by the extinguishment of such easements, and by that means the amount of such payments may be included in the assessment.

3. SAME—PURCHASING FRANCHISES.
    Where an elevated railroad company purchases from other companies their franchises, the indebtedness so incurred is not a deductible indebtedness in the assessment of the company's property for taxation, as the franchises purchased are not taxable property.

4. SAME—MERGER AGREEMENT.
    Relator, the Manhattan Elevated Railroad Company, entered into a merger agreement with the Metropolitan Elevated Railroad Company and New York Elevated Railroad Company, by which it acquired the right to use the elevated structures of these two companies for the purpose of operating its road. In consideration of this agreement, relator took up a bonded indebtedness of the New York Company. No apportionment was made between the values of the tangible parts of the property acquired under this agreement and the franchises. The value of the franchises, however, was estimated at much more than the indebtedness. Held a fair inference that the entire indebtedness was incurred in payment for the franchises.

5. SAME—DEBTS DUE TO RAILROAD COMPANY.
    By an agreement between the Metropolitan Railway Company and the Manhattan Railway Company, the Manhattan Company was to use and ultimately become the owner of the structures of the Metropolitan Company, and assume its debts. The Manhattan Company expended money on the Metropolitan structures, and charged it to the Metropolitan Company, and it constituted a lien on the property until the agreement was executed. Held, that this credit was assessable for taxes against the Manhattan Company until the agreement was executed.

6. SAME—UNPAID DIVIDENDS.
    Where unpaid dividends of a railroad company have been applied to the improvement of the company's realty, and bonds issued to the stockholders, instead of the scrip representing dividends, such bonds are deductible from the indebtedness, as they represent taxable property.

7. Same—Presumption as to Unimpaired Capital.

In the assessment of the property of a railway company, where the cost of the structures only is given, not their value, and there is no evidence as to the value of the right of way and the franchises, the proper way of computing such values is to regard capital stock as unimpaired, and assume that, as the capital is unimpaired, there are other assets sufficient to cover the outstanding debts.

Certiorari to review assessments for taxes, on the relation of the Manhattan Railway Company against Edward P. Barker and others, as commissioners of taxes and assessments. Dismissed.

Davies, Stone & Auerbach (Julien T. Davies, of counsel), for relator.

John Whalen, Corp. Counsel (William L. Turner and James M. Ward, of counsel), for respondents.

NASH, J. In 1894 the commissioners of taxes and assessments of the city of New York assessed the relator upon its capital stock and surplus $17,860,712. In their return to the writ of certiorari brought to review this assessment the commissioners stated that the method by which they made their assessment was by a comparison of the statement furnished to them by the relator in 1894 with the statement furnished upon its application for a reduction and cancellation of the assessment against it for the year 1893; and upon what they termed an admitted liability in the year 1893 they concluded that the sum which they fixed for the assessment for the year 1894 would be, in all respects, just and fair. No other method of valuation was stated by the commissioners. This, however, was done by their counsel, and upon consideration by the court of the method which counsel stated that the commissioners adopted in reaching the amount of the assessment it was concluded that the assessment was erroneous, in that an improper method of ascertaining the actual value of the relator's real estate was adopted, and hence erroneous for the purpose of ascertaining the value of the relator's capital subject to assessment; that the method which it was stated was adopted involved the presumption that the indebtedness of the relator represents property to the amount of such indebtedness in addition to that represented by its capital stock, which presumption could not be indulged; and that the proposed method of assessment necessarily included the value of franchises possessed by the corporation, which could not properly be included in the assessment under review. The order of the general term was reversed, and that of the special term modified so as to vacate the assessment made, and order a reassessment by the commissioners. People ex rel. Manhattan Ry. Co. v. Barker, 146 N. Y. 304, 40 N. E. 996. The reassessment directed by the order fixed the valuation for the purpose of taxation of the relator upon its capital and surplus for the year 1894 at $15,526,800. At the hearing upon the writ and return a reference was ordered, to take and report the evidence upon certain points, and by amendments of the order the referee was directed to take and report the evidence as to all the other issues, with his findings of facts and conclusions of law thereon. The matter is here for final hearing and decision upon all of the proceedings, the report of the referee, and the evidence.

It is conceded that the method of valuation which the respondents state in their return they adopted in making the reassessment is erroneous, and that it is for the court to determine whether the assessment is erroneous, and, if so, to order the correction of the roll, in whole or in part, in such manner as shall be in accordance with law. The point is made by counsel for the relator that the findings of fact and conclusions of law of the referee are conclusive upon the court. The statute seems to be plain upon this question. The findings of fact and conclusions of law constitute a part only of the proceedings upon which the court shall determine the validity or invalidity of the assessment. Tax Law, § 253. It is understood that the statute contemplates a valuation of the capital of the company as distinct from the value of its share stock (People v. Coleman, 126 N. Y. 443, 27 N. E. 818); that, for the purpose of ascertaining its capital subject to taxation, all the capital owned by the company, both real and personal, shall be valued, and that there be deducted therefrom the aggregate assessed value of its real estate (People ex rel. Equitable Gaslight Co. v. Barker, 144 N. Y. 94, 39 N. E. 13); that under this statute the franchises of a corporation are not assessable (146 N. Y. 304, 40 N. E. 996).

The referee finds: That upon the second Monday of January, 1894, the valuation of the relator's property was as follows:

| | | |
|---|---:|---:|
| Cost of replacing foundations, roadbed structures, and superstructures for the relator | $8,770,587 00 | |
| Fair market value of its other real estate | 5,120,216 00 | |
| | | $13,890,803 00 |
| Rolling stock | | 2,355,777 72 |
| Cash | | 1,382,838 00 |
| Tools and machinery | | 381,538 00 |
| Open accounts | | 2,023,487 57 |
| Total valuation | | $20,034,444 29 |
| Deducting the assessed value of the relator's real estate | | 7,323,200 00 |
| The remainder liable to assessment is found to be | | $12,711,244 29 |

That on the 8th day of January, 1894, the relator was earning, and had been earning for the year previous, more than sufficient to pay its running expenses and the interest upon its bonded indebtedness, and a dividend of 6 per cent. upon its issued and outstanding stock, and that on that day its stock was quoted at 121⅜ bid, 122 asked. That of the capital stock there had been issued $29,925,200. That on the 8th day of January, 1894, the relator owned stocks in other companies, which were taxed on their capital, not included in the above valuation of assessable property, to the amount and value of $7,075,200. It is found: That on the 8th day of January, 1894, the relator was directly liable to pay the following bonds and debentures, which had been issued by the following named corporations, respectively:

| | |
|---|---:|
| Manhattan Railway Company, consolidated 4's | $11,663,035 |
| New York Company, first mortgages | 8,500,000 |
| New York Company, debentures | 1,000,000 |
| | $21,163,035 |

That no part of this indebtedness was contracted or incurred in the purchase of nontaxable property or securities. The conclusion of the referee is that the amount of the deductible indebtedness of the relator exceeded the value of its property liable to assessment, and therefore the reassessment of the capital stock and surplus of the relator for the year 1894 was and is erroneous and illegal, and should be wholly vacated, and stricken from the assessment roll.

It is found by the referee that on the second Monday of January, 1894, the Manhattan Railway had paid for fee and rental damages to abutting owners along the streets upon and through which the said Manhattan Railway operated lines of elevated railways within the city and county of New York, $7,932,981. It is also found that the proceeds from sales of $10,000,000 of the $11,663,035 consolidated 4's went into the general cash fund of the Manhattan Railway, into which the earnings and all other income of the company were paid, and out of the fund so constituted were made the payments for fee and rental damages, amounting to $7,932,981. These payments are challenged by counsel for the respondents as not a proper item of deductible indebtedness, and, as the reasons urged for its nondeductibility do not apply to the questions which relate to other indebtedness, it will be convenient to treat the questions relating to this item separately. The reasons urged for its rejection as an item of offset are that it is an indebtedness contracted to meet the expense of acquiring or extinguishing easements of abutting owners, not assessable as such, and therefore nontaxable. The argument is tersely stated by respondents' counsel as follows:

"In the case at bar the servient estate is the right or privilege bestowed by the state and subsisting in the relator to maintain its structure and operate its road in the public streets, such rights or privileges constituting its franchise. This franchise is property, but it is nontaxable property for any local purposes. What the relator receives from the legislature is the mere naked or barren fee of this franchise, subject to easements of light, air, and access appurtenant to the abutting property. Both these easements and the franchise are, within all the authorities, property, but both are nontaxable property. When the easements have been acquired or extinguished, but not before, the relator possesses the unincumbered fee of its franchise, free from the burden of the superior rights incident to abutting ownership. These rights are not assessable, therefore, directly or indirectly, through the assessment of the franchise, because they cannot be assessed at all. After these easements have been acquired, or, if you choose, extinguished, but not before, an unincumbered franchise may be enjoyed, or mortgaged, or assigned to any one having capacity to take. They are property before they are acquired, because they are represented by the unincumbered franchise. Both before and after acquisition they are nontaxable."

There is authority for the proposition in what Judge O'Brien had to say of the matter in the proceeding to review the assessment of the relator for the next year.

"There was also," he says, "included in the item over $8,000,000 paid as damages to abutting owners of land. This sum represented no property whatever, but was paid in order to remove a legal obstacle to the exercise of the franchise. The easements of light, air, and access for which this sum was paid were of only nominal value, and the expenditure may be regarded as made to remove or extinguish an incumbrance upon the franchise to operate a railroad. Apart from the franchise, which could not have been considered, this item represented no element of actual value."

59 N.Y.S.—59

Counsel for the relator says that the payment of these land damages did not result in the acquisition of any property by the railroad companies,—merely extinguished pro tanto the easements of abutting owners, and released the franchises of the Manhattan from a burden, and possibly made them more valuable. The same reason, it is said, which exempts franchises from taxation, must also exempt this quasi right of way. Both are privileges; one coming from the public owner of the street, the other from private owners of easements in the streets. One is the right to trespass upon public property, the other upon private. If there be any difference, the franchise or right of way in the streets acquired from the public is the more tangible of the two, for, if it is the right of way over corporeal property, the property of the relator, which is represented by the payment of these land damages claims,—if it be property,—it is an incorporeal hereditament not contained in the statutory enumeration of things taxable. Both rely upon Baker v. City of New York, 31 App. Div. 112, 52 N. Y. Supp. 533,—respondents' counsel, that it determines that easements of light, air, and access are nontaxable property; relator's counsel says the case decided precisely the contrary,—that it determines that easements of light, air, and access are taxable property, and are included in the valuation of the servient estate, and taxed through it. In that case the plaintiff, Baker, brought an action to recover the amount of an award made to him for certain property taken by the city for school purposes. The city admitted the making of the award, and as a defense alleged that as to certain land the commissioners awarded to unknown owners, as the value of the fee of the land, the sum of $4,403, and to Baker, as the value of an easement, to which said lots were subject, appurtenant to adjoining property owned by him, the sum of $13,551; the award to the unknown owners being for the naked or barren fee, which was subject to the plaintiff's perpetual easement of light, air, and access. The city alleged that as the plaintiff, by reason of his said easements, had the entire beneficial enjoyment in said lots, which were subject to certain taxes and assessments, the amount thereof should be charged pro rata against his award of $13,551 for said easements and against the award to unknown owners for the value of the fee. It was decided upon demurrer to the answer that, while the plaintiff's interest in the land was "property," within the meaning of that term, and within the protection of the constitutional prohibition against the taking of property for private use without compensation, it was a right in the land taken which was appurtenant to adjoining property owned by the plaintiff,—a right acquired by grant of the owner of the land which had passed to the plaintiff's grantor; and that taxes or assessments upon the land taken, as between the owner and the person in whom the easement is vested, were not payable by the owner of the easement, and therefore the plaintiff was entitled to recover of the city the full amount of the award. How it came that the assessment of the servient estate included the value of the easement, the case does not show; probably because the interests of the unknown owners were not looked after. The value of the easement should ordinarily have been con-

sidered in the valuation of the dominant estate. When an ease-
ment is carved out of one property for the benefit of another abut-
ting, the value of the servient estate is thereby lessened, and that of
the dominant increased practically by just the value of the ease-
ment, and the respective tenements should thereafter be assessed
accordingly, the determinate question of assessable value being the
amount for which each of the properties affected would sell. This,
in effect, is precisely what Judge Tracy said in Story v. Railroad
Co., 90 N. Y. 176:

"The opening of a city street makes the property abutting thereon available
for the purposes of trade and commerce, and greatly enhances its value. The
act of 1813 proceeds upon the assumption of this well-known fact, and the
damages sustained by reason of the taking were assessed in view of the
trust assumed by the public that such lands were to be kept as open public
streets forever. The public did not assume to take the lands in fee-simple
absolute, but took and paid for a lesser estate; and, in pursuance of the theory
of the statute that the abutting owner has a special interest in the street, the
cost of the lands was immediately assessed back upon the abutting property."

Without determining the question discussed by counsel as to
whether or not the indebtedness for land damages is a deductible
item, I proceed to the presentation of what I regard a more prac-
ticable and correct method of assessment of property for which the
referee finds that up to January, 1894, the relator had paid nearly
$8,000,000. The case of People v. Clapp, 152 N. Y. 490, 46 N. E. 842,
was a proceeding to review the assessment of the relator's real
estate in the town of York, Livingston county, the property assessed
being 7¼ miles of the main line of the relator's railroad, running
from Binghamton to Buffalo, a distance of 200 miles. The assessors
stated in their return that in fixing the sum at which the real prop-
erty was assessed they considered the same, not as a separate piece
of real estate standing alone, but as a part of the valuable and ex-
tensive system of railroads operated by the relator, and based the
assessment thereof upon the cost, rentals, and earnings of said rail-
road. In the opinion of Judge O'Brien, writing for the court, it is
said: That where the assessors have jurisdiction over all the prop-
erty of the corporation within the state, whether it be real estate,
capital stock, or franchises, they may deal with every element of
value that constitutes property of the corporation, or enters into
its earning or producing capacity. But in most cases in this state
the assessors have jurisdiction only over a part of the corporate
property; that is, real estate. That the earnings of a railroad in-
clude the earnings of the personal property as well as the real es-
tate, and the use of its franchises. That it is impossible, in adjust-
ing the value of the real estate of a railroad in a town, to apportion
the earnings, and credit the just proportion to real estate, to personal
property, and to franchises; and that the cost of reproducing the
seven miles of railroad seemed to be the just and reasonable rule of
valuation. That, it being a paying road, it should be valued at what
it would cost to procure the land, construct the roadbed, put down
the ties and rails, and erect the buildings. This was the decision
of the court. In appraising the damages sustained by a person
whose land is taken for the purpose of a railroad, the effect upon

the market value of the property remaining is considered, the land-owner being entitled not only to the value of the land taken, but also to the diminution in value of that from which it is severed; usually the damages to contiguous property being many times the value of the land taken,—as, for illustration, in one instance in another proceeding it appeared that the Lackawanna road took 7 acres and a fraction of land, worth less than $100 an acre, and $3,800 damages were awarded; and in another case, for 99 feet in width and 758 feet in length, 1.72 acres of right of way taken, $6,250 damages—largely to buildings—were awarded. The condemnation or grant, when voluntarily made, is of the land in the right of way only, but carried with it is the easement in the contiguous property for the purpose of operating the road. The easement is part of the property taken, the expense of which is part of the cost of obtaining the right of way for the purpose of construction, and must, therefore, be included as part of the cost of reproduction of the road, within the rule in the Clapp Case.

Within the same principle the easement in the properties of abutting owners, acquired by the companies in the construction or operation of the roads of the Manhattan system, constitute a part of the real estate of the relator, and should be valued as such. If the law, as settled in the Story Case, had been understood originally, the easement in abutting property for the purpose of building and operating the road would have had to be acquired by condemnation or by grant before the road could have been constructed. The relator's road is to be valued, as stated by Judge O'Brien, "at what it would cost to procure the land (right of way and easement), construct the roadbed, put down ties and rails, and erect the buildings and structures," all in the manner of constructing elevated railroads; not, as urged in behalf of the respondents, the cost of removal and rebuilding. That was not in the mind of the court in announcing the cost of reproduction as the rule of valuation, but the cost of production of a system of railroads such as this at the time of the assessment, if there were no railroad in existence. Some confusion has arisen in considering what has been taken. The railroad company has not acquired the easement of the abutting owners. It has extinguished their easements of light, air, and access in the streets, and acquired an easement to operate its road. No property has been lost; certainly not for the purpose of taxation. It has simply been transferred. The properties of the abutting owners have been depreciated in value by the loss of their easements, and the value of the property of the relator has been increased, because of its magnitude, to a far greater extent by the acquisition of the right to operate its road. It is property precisely like that for which the plaintiff in the Baker Case was awarded $13,551 for his easement in abutting property, for the fee of which the owners were awarded only $4,403. It is property which would pass by a conveyance of the road. It is property which, in the case of individual owners, would be assessable to the owner in the additional value of his real estate. The same rule which would be applied to individual owners should be regarded as applicable to the property of the relator. The char-

acter of the property which is acquired, and the nature of its acquisition, very clearly appear in the examination by Mr. Davies of Mr. Gaynor, auditor of the relator, in the proceeding before the tax commissioners:

"By Mr. Davies: Q. Can you tell about what the company had paid to settle the damage claims of abutting owners on the second Monday of January, 1894? A. Approximately, about $8,000,000. Q. And should you say that about half of that represented claims for annual damages in the nature of rent, right of way, prior to that time, and half represented future damages from the operation of the road? A. It is divided about in half."

The further principal question is whether indebtedness incurred in the purchase of the franchises from the other companies by the Manhattan is a deductible item of indebtedness. The contention of the respondents' counsel is that franchises are nontaxable property, within the meaning of the Revised Statutes, which provide, "No deduction shall be made or allowed for or on account of any debt or liability contracted or incurred in the purchase of nontaxable property or securities." 5 Rev. St. (9th Ed.) p. 3219, § 6. On the part of the relator it is urged that nothing can be conceived to be within the scope of this language that is not found to be treated in the statutes as property; that nowhere in the system of taxation, or in the legislation of the state, do we find franchises spoken of as "property." That is true. We do not find franchises spoken of as taxable or as nontaxable property. The statute makes no enumeration of property other than that which is taxable, and allows a deduction for debts owing by the person assessed, but does not allow the deduction of any debt contracted in the purchase of nontaxable property; that is, property which is not enumerated as taxable. Again, it is urged by the relator that, as franchises are taxed specifically by the state, it is not nontaxable property, while the respondents insist that nontaxable property, within the meaning of the statute, is that class of property which is not taxable or assessable for local purposes. The question is not without difficulty, but it seems to me that the latter is the more reasonable interpretation. The object of the provision, that in assessing the personal property owned by a person "no deduction shall be made or allowed for or on account of any debt or liability contracted or incurred in the purchase of nontaxable property or securities held by him, or held for his benefit, nor for or on account of any indirect liability as surety, guarantor, indorser, or otherwise," was to prevent the deduction of indebtedness for property which could not be reached by the assessors for the purpose of taxation,—property exempt from taxation for the purposes for which the assessors have the power to assess,—and to prevent more than one deduction of the same debt, as would be the case if indirect indebtedness were deductible. The legislature did not intend to depart from the principle that all property should be made to share equally in the public burden; that taxes should be so imposed that "no one class of individuals and no one species of property should be unequally or unduly assessed." This principle would be violated if the term "nontaxable" should be construed so as to permit the amount of the indebtedness of the relator

contracted or incurred in the purchase of the franchises to be deducted from the value or its assessable property, and thereby exempt the relator's property, represented by its indebtedness for franchises, from all taxation for the support of the local government, as well as its share of the tax levied by local assessment for the general purposes of the state. In the Revised Statutes "taxable inhabitants" only are mentioned as the persons to be assessed, and the words there used relative to the property to be assessed, and the debts owing by "such person" to be deducted, are descriptive of the property and indebtedness of individuals. Franchises were not in the mind of the legislature. Besides, although something is sometimes paid for privileges conferred upon corporations, no indebtedness is ever directly incurred to the municipality for or on account of the grant of franchises. The case here is peculiar and exceptional in this: that one corporation has become the purchaser of franchises granted to others. It is to be observed that the statute relating to the taxation of the capital stock of corporations does not in itself contain a complete system of assessment. In general language it provides that it shall be taxed "in the same manner as the other personal property and real estate of the county."

Having adopted the theory of the counsel for respondents, it becomes necessary to look into the transactions by which the relator obtained the property for the purpose of ascertaining what part of its indebtedness may be said to have been incurred for franchises. In May, 1879, the New York Elevated Railroad made and entered into a lease with the Manhattan Company by which it leased to the latter company its railroad in the city of New York, owned and operated by it, and the unfinished portions thereof then under construction, and all its franchises, rights, and privileges relating thereto and to the construction and operation of its entire railway, as authorized, for the term of 999 years, and for certain rentals agreed to be paid therefor; and in addition thereto, in consideration of the lease, the Manhattan Company assumed, covenanted, and agreed to pay $8,500,000 first mortgage bonds of the New York Company, secured by mortgage upon its road, and "keep it safe and harmless at all times from all claims and demands against it arising from or under the said bonds, or any of them," and to pay all taxes and assessments which should become due and payable by, or be levied, assessed, or imposed during said term by, any lawful authority upon the New York Company, or upon the demised railway or premises. At the same time, and bearing the same date, the Metropolitan Railway made a lease to the Manhattan Company of its road and franchises for the same term; and in addition to the rents reserved, and in consideration of the lease, the Manhattan Company assumed and covenanted to pay $8,500,000 first mortgage bonds of the Metropolitan Company, and save it harmless from all claims and demands arising thereon, and to pay taxes and assessments, as provided in the lease of the road of the New York Company. The Manhattan Company entered into possession of the properties of the lessor companies under these leases, and was in the occupancy thereof under various modifications of the leases and under various agree-

ments of the parties until August 1, 1884, when the three companies entered into a tripartite agreement, by which it was provided that the Manhattan Company should take a transfer of the capital stock of the stockholders of each of the other two companies, or of so many as might choose to make such transfer, and issue in exchange therefor the stock of the Manhattan Company upon the terms therein stated; and when the agreement should have been ratified, as therein provided, and a majority of the stock of the other two companies transferred to the Manhattan Company, it should assume and become responsible for, and pay, satisfy, and discharge, all the liabilities, debts, and obligations of the other two companies, and indemnify them against the same, and hold them harmless therefrom. The agreement contained this further provision:

"The Manhattan Company shall also be entitled to so much of the property of the New York and Metropolitan Companies, and each of them, as shall equal the amount of the debts, obligations, and liabilities hereby assumed or indemnified against, and may make use of such property from time to time as the Manhattan Company may be compelled to pay or discharge the same."

The purpose of this agreement was to effect a merger of the Metropolitan and New York Companies with the Manhattan, under the merger statute, so called (Laws 1879, c. 503). On the second Monday of January, 1894, the Manhattan Company had acquired all of the stock of the New York Company, and had become vested with the title to all of its property, but had not acquired all of the stock of the Metropolitan Company, and as to that company the tripartite agreement was then still in force. It did acquire all of the stock of the Metropolitan a few months later, and became vested with the title to all of the property of the latter company. The Manhattan Company originally possessed no franchises other than the franchise to be a corporation, and was organized for the purpose of acquiring, by lease or otherwise, the use of the franchises and properties of the Metropolitan and New York Companies. The capital stock of the relator first authorized was $13,000,000, and the entire amount was issued and delivered to the stockholders of the Metropolitan and New York Companies, the referee finds, "as an inducement and consideration for the consent of the stockholders to the making of said leases." The capital stock was subsequently increased to $26,000,-000, of which $11,050,000 was issued to retire the $13,000,000 originally issued to the Metropolitan and New York stockholders, $7,-150,000 at par in exchange for $6,500,000 capital stock of the Metropolitan, and $7,800,000 in exchange for $6,500,000 stock of the New York Company. The capital stock of the relator was further increased $4,000,000, which was exchanged for the same amount of stock in the Suburban Rapid-Transit Railroad, leased by and merged into the Manhattan Company. On the second Monday of January, 1894, all of the stock of the relator, $30,000,000 in amount, had been actually issued as stated, except there remained $74,800 of the stock, which was not issued to the stockholders of the Metropolitan Company until a few months later. The referee finds that, in addition to the $13,000,000 original stock of the Manhattan Company, issued to the stockholders of the lessor companies, there was paid in cash

the lessor companies to obtain the leases $1,014,000,—in all $14,-
014,000, stated in the report of the Manhattan Company to the rail-
road commissioners as "cost of lease." In his opinion the referee
says:

"All that the Manhattan Company acquired by the leases was the right to
have possession of and use the elevated structures and their appurtenances for
the purposes for which they were designed, and for which alone they were
authorized. This was, in substance, no more than the right to use the fran-
chises of the lessor corporations. The cost of the leases was, therefore, the
cost of the franchises, and this included the whole of the disputed item of
$14,014,000."

Counsel for respondents adopt this theory of the case, which is
also that of the relator's counsel, and argue very properly that, as
the relator took nothing but franchises by the leases, all of the in-
debtedness of the lessors which the relator covenanted and agreed
to pay for the demise was for franchises, and that the indebted-
ness of the New York Company upon its $8,500,000 first mortgage
bonds, which, by the merger agreement, and the complete vesting of
the property of that company in the relator by the terms of the
merger statute, has become the direct debt of the relator, is an in-
debtedness incurred for franchises. The covenant in the merger
agreement to pay the indebtedness of the New York Company is only
a further agreement to pay the $8,500,000 first mortgage bonds of that
company, as in the lease therein referred to it was covenanted and
agreed by the relator to pay these same bonds. The brief of the re-
lator's counsel states:

"Both the $8,500,000 of the New York first mortgage bonds and the $1,000,-
000 of the New York debenture bonds were assumed and agreed to be paid by
the Manhattan Company by the seventh clause of the merger agreement of
August 1, 1894, as part of the consideration of the purchase of the franchises
and real and personal property of the New York Company by the Manhattan
Company through the merger statute."

Counsel does not make the apportionment as between franchises
and the tangible property for which the indebtedness was assumed,
but, as he puts the value of the franchises acquired by the relator of
the lessor companies at $50,000,000, the fair inference is that these
items of indebtedness were incurred for franchises. The Metropoli-
tan Company not having been merged in the Manhattan, and separate-
ly assessed, its indebtedness is not here considered.

Next to be considered is the item, "Open accounts, $6,217,939.79,"
stated as an asset in the report of the relator to the railroad commis-
sioners for the year ending June 30, 1893. The item is found by the
referee as an asset of the Manhattan, but at only the sum of $2,023,-
487.57, upon an admission made in an affidavit of the treasurer of the
relator. This whole item of $6,217,939.79 was an indebtedness due
from the Metropolitan to the Manhattan Company, and represented
the expenditures of the Manhattan on the structures of the Metro-
politan in excess of the amount provided by the latter company to
meet expenditures, as testified to by Mr. Gaynor, and was carried
on the books of the Manhattan as an asset. But upon his subse-
quent examination he explained that the $2,023,487.57 is what re-
mained of the $6,217,939.79 after deducting the amount therein in-

cluded for payments made by the Manhattan in settlement of claims against the Metropolitan, which he was advised by counsel was not a charge against the Metropolitan "for the purpose of a legal asset." It is now contended by counsel for relator that on the second Monday of January, 1894, the Metropolitan owed no debt to the Manhattan capable of enforcement, or that was assessable, and that the entire item, "Open accounts, $6,217,939.79," should be omitted from the relator's assets. The claims of the respective counsel rest upon the legal effect to be given to the merger contract, the seventh clause of which provides:

"So soon as this agreement shall have been ratified by the holders of a majority of the capital stock of each of the three companies in corporate meetings, and a majority of stock of each of the New York and Metropolitan Companies shall have been thereupon surrendered and transferred to the Manhattan Company, the said Manhattan Company shall, in consideration of the making of this agreement by each of the others, assume and become responsible for, and shall pay, satisfy, and discharge, all the liabilities, debts, obligations, causes of action, claims, and demands of every nature which against the New York and Metropolitan Companies, and each of them, do now or hereafter may exist, and shall indemnify the said last-mentioned companies against the same, and shall hold them harmless therefrom."

The claim of counsel for the relator is that this obligation of the Manhattan Company has the effect of discharging the Metropolitan Company from any liability to repay to the Manhattan any sums which, prior to the surrender of a majority of the stock of the Metropolitan Company, under the agreement of August 1, 1884, might have been due from the Metropolitan to the Manhattan. This, he says, was destructive of the debt. Counsel for the respondents claim that the whole of the item must be regarded as an indebtedness of the Metropolitan until the merger took place under the statute by acquisition by the Manhattan of all the stock of the Metropolitan, and relies upon the further provision of the merger agreement above quoted, by which it was provided that the Manhattan Company should be entitled to so much of the property of the Metropolitan Company as shall be equal to the amount of the debts, obligations, and liabilities assumed or indemnified against, and might make use of such property, from time to time, as the Manhattan might be compelled to pay or discharge the same. The effect of this provision of the merger agreement is as respondents' counsel claim. The indebtedness remained enforceable by judgment, if necessary to reach the property pledged to pay it, until such time as the liabilities assumed and indemnified against lost the character of assumed liabilities secured by lien upon property of the Metropolitan of equal amount, and became the actual liabilities of the Manhattan by the vesting in it of the estate, property, rights, privileges, and franchises of the Metropolitan under the merger statute, which event did not occur until after the second Monday of January, 1894. This was not only so regarded by the parties, but it was expressly assented to by the Metropolitan Company in the mortgage of the Metropolitan and Manhattan Companies to the Central Trust Company, on the 26th day of February, 1890, to secure the proposed issue of forty millions of Manhattan first mortgage bonds, which is

in evidence, but not before the referee. It recites the provisions of the merger agreement here referred to, and the facts showing that the complete merger had not taken place, and the habendum clause provides as follows:

"But until all the capital stock of the Metropolitan Company shall have been surrendered or transferred to the Manhattan Company, in accordance with said agreement dated the 1st day of August, 1894, and the merger therein provided for shall have been completed, the lien and charge created and intended to be created by these presents upon the corporate property and franchises of the Metropolitan Company shall extend only to the amount which the Manhattan Company is now or shall hereafter become entitled to out of the Metropolitan Company's property, as provided in the aforesaid agreement, including all amounts which are due or shall hereafter become due to the Manhattan Company for expenditures made or to be made by it in acquiring rights of way and otherwise completing, finishing, and operating the railroads of the Metropolitan Company."

The referee finds that a dividend was declared by the Manhattan Company, representing $1,488,035 of surplus earnings, which had been invested in betterments; that this dividend was paid to the stockholders in scrip, which was, by its terms, convertible into bonds of the company at the company's pleasure, and that of the $11,-663,035 of Manhattan mortgage bonds $1,488,035 were used in reducing or retiring the said convertible scrip, and constituted a proper item of deductible indebtedness. The contention of the respondents is that this $1,488,035 of Manhattan 4 per cents. represented unpaid dividends, and was therefore not deductible; that the case here is similar to, and in effect the same as, that of People ex rel. Hawley Box-Lumber Co. v. Barker, 23 App. Div. 532, 48 N. Y. Supp. 557. There the dividend was declared, but had remained for several years unpaid; a mere formal action, without any intention to pay over the dividends to the stockholders, and without any change in the status of the invested funds of the corporation used in the transaction of its business. Here, instead of paying the money to the stockholders, it has been actually expended in improvements of its real estate, and the scrip issued to its stockholders has been taken up by the issue of bonds, convertible and transferable,—an indebtedness of the relator the same as if it had actually borrowed the money upon its bonds, and expended it upon its real estate; and effect must, I think, be given to the transaction as such. The result, giving effect to the views here expressed, is that there should be added to the valuation of the relator's real estate, as found by the referee to be assessable, the land damages as part of the cost of reproduction. The amount of land damages paid had increased by January 14, 1895, as stated by counsel, to $8,382,891.45, divided into fee and rental damages and costs. The costs are part of the expense of obtaining the right of way. How much of the rental damage was paid for the right of way or postponed fee damage does not appear. But the cost of reproduction would include the entire right of way, which would have to be condemned and paid for before the road could be constructed, only part of which has been ascertained by the amount which has been paid. The interest upon the amount paid for the right of way for the period of construction of the road would also be an item to be taken into the account. The evi-

dence, therefore, does not furnish data upon which a valuation can be put upon the relator's real property, based upon the cost of reproduction. But I am of the opinion that cost merely of the relator's real estate is not the correct measure of valuation. The rule applied in the Clapp Case for the valuation of the real estate of a railroad company in a town is a departure from the express command of the statute, adopted of necessity, and not because the statute requiring real estate to be assessed at its full value is not applicable to railroads. Judge O'Brien says:

"Where the assessors have jurisdiction over all the property of the corporation within the state, whether it be real estate, capital stock, or franchises, they may deal with every element of value that constitutes property of the corporation, or enters into its earning or producing capacity."

Here the tax commissioners have jurisdiction over all the property of the relator, not to assess the franchises of the relator, but for the purpose of assessing its capital stock and surplus subject to assessment. There is no reason why they should not obey the direction of the statute, and assess the relator's railroad at the sum for which, in their judgment, "such property would under ordinary circumstances sell." The relator's property, like that of individuals, should be valued at what it would sell for. The railroad of the relator has not the unique character of property having no market value. In these days of immense aggregation of capital in the control of individuals, singly or in combination, the relator's entire system of railroads could be sold in open market at its full and true value, based upon cost and earning capacity, as readily as very many of the large commercial buildings. The evidence was directed to the value of the relator's property in 1894, the merger of the lessor companies having been substantially completed at the time of the assessment. Its balance sheet of June 30, 1894, stated its liabilities at $72,787,217.13, and assets of an equal amount. It had an assured present and increasing business, with an earning capacity sufficient to pay a 6 per cent. dividend upon its capital stock and the interest upon its indebtedness. For the year ending June 30. 1893, it had a surplus of $1,171,291.68, and for the year ending June 30, 1894, $522,647.24. Its stock was more than 20 per cent. above par. It was not a question whether, under such conditions, the relator's property would sell for an amount equal to its capital and indebtedness at par. The question for the tax commissioners to consider was, how much more would it have sold for? From the selling value of the property the value of the franchise is to be deducted for the purpose of assessment. What proportion, therefore, of the value of the property is to be apportioned to capital, and what to franchise? The following is the testimony of Mr. Gaynor on this subject:

"By Mr. Davies: Q. The railroad commissioners' report ending June 30, 1894, as has been said, takes in all the companies,—the New York, the Metropolitan, and the Suburban,—I believe? A. Yes, sir. Q. Now, can you give me the value of all the assets of the Manhattan road substantially as of the time when the report was made? You have computed the value as of the 30th of January, 1895, for the purpose of these proceedings? A. That would be substantially the same. Q. What was that value of the assets of the Man-

hattan Railway on the second Monday of January, 1895? A. About $27,000,-000. Q. Now, that was the valuation as testified to by you and Mr. Waterhouse, and Mr. McWilliams, and Mr. Zittell, and the other witnesses, in the tax proceeding of 1895, and is to be found on page 44 of the printed record of the 1895 proceedings, is it not? A. Yes, sir. Q. Now, take the report of the railroad commissioners for the 30th of June, 1894, from page 164 of the return in the 1894 proceeding, the total book assets, carrying your road and equipments at their cost in stock, bonds, and cash, as you have testified, as appears from the report, was $72,787,217? A. Yes. Q. Now, the difference between this $27,000,000 of property at that time owned by the Manhattan road and the $72,000,000 would be about $45,000,000? A. Yes. Q. You have testified that, in your judgment, the value of the franchises of the Manhattan road on the second Monday of January, 1894, if they were all taxed together at that time, and the second Monday of January, 1895, was about $50,000,000. Is that your view? A. That is my view. Q. At least about $50,000,000? A. That is my judgment. Q. Both during the years 1893 and 1894 and 1895 the Manhattan Company was earning the interest on its bonded indebtedness, and its 6 per cent. dividend on its stock, was it not? A. Yes, sir. Q. And did you arrive at this estimate of about $50,000,000 by making the deduction that I have referred to of the actual value of the taxable assets of the Manhattan, taking them at, say, $27,000,000 from the book value of the assets, taking them at $72,000,000? A. Yes, sir."

On the examination of Mr. Gaynor and Mr. McWilliams, secretary and treasurer of the Metropolitan and Manhattan Companies, in another proceeding, they had both testified that it was an impossibility to put a cash value on the relator's franchises. Mr. Gaynor only was sworn as a witness in this proceeding, and on this subject was the only witness. He says he had taken the ground that it was impossible to state the value of the franchises, but that the other examination had opened up a new line of thought, and the result of that was his testimony here. The method Mr. Gaynor adopted is correct. It is the only possible way in which the value of a franchise can be ascertained. The whole property, tangible and intangible, must be first ascertained, and then apportioned or divided between capital and franchise. He solves the problem in this way: Given a corporation with a capital of $30,000,000, an indebtedness of $42,000,000, tangible assets, $27,000,000, an earning capacity sufficient to pay the interest upon its indebtedness and a dividend of 6 per cent. upon its capital, besides creating an annual surplus of from a half to a million dollars; the value of the property is to be apportioned by the allotment of $50,000,000 of the $72,000,000 valuation to franchise, leaving $22,000,000 to reimburse capital. The idea is more than absurd. At that rate, every corporation owning a franchise, no matter how prosperous its business, may be regarded insolvent. If the proposition be acceded to, every such corporation may entirely escape taxation upon its capital and surplus. The valuation of capital and franchise was not so considered in purchasing these properties. The testimony of Mr. Gaynor is that the bonus of $13,000,000 of stock of the Manhattan issued to the stockholders of the Metropolitan and New York to procure their consent to the leases, and the $1,014,000 cash paid to those two companies, "represent the assumed earning power of the New York and Metropolitan Elevated Railroad lines in excess of the amount which the Manhattan Railway was obligated for in the way of interest upon the bonds of said companies, and the dividend which said Manhattan

Railway had agreed to pay to the said two lessor companies. All there is of a franchise is comprised in its use. This, for the period of 999 years, was acquired by the leases, for which a bonus of $13,-000,000 stock and $1,014,000 cash, amounting to $14,014,000, was paid. The leases gave the relator the use of the railway lines and the franchise. For the stock of the stockholders of the three lessor companies the relator issued of its consolidated stock $18,-950,000, and it assumed indebtedness of the New York and Metropolitan Companies, and expended in the extension and improvement of its railway lines and properties $35,885,000, the amount of its funded debt on the 30th of June, 1894, a total of $54,835,000, aside from the amount which may be attributed to the purchase of franchises. It is of no consequence that in the experimental period of construction of elevated railroads the original companies sold their bonds at large discounts. This is the sum which these properties were regarded worth, and in the purchase of which they have cost the relator in its stock and bonds.

It will also be observed that for the purpose of procuring an estimate by Mr. Gaynor of the value of the franchise the whole of the property was not included. The capital stock of the company held in shares by the corporators should have been included for the purpose of estimating the value of its franchise. This is made very clear by Judge Finch in the Coleman Case, where he says:

"The capital stock of a company is one thing; that of the shareholders is another and different thing. That of the company is simply its capital, existing in money or property, or both; while that of the shareholders is representative, not merely of that existing and tangible capital, but also of surplus, of dividend-earning power, of franchise, and the good will of an established and prosperous business. The capital stock of a company is owned and held by the company in its corporate character; the capital stock of the shareholders they hold and own in different proportions as individuals. The one belongs to the corporation; the other to the corporators. The franchise of the company, which may be deemed its business opportunity and capacity, is the property of the corporation, but constitutes no part or element of its capital stock; while the same franchise does enter into and form part—and a very essential part—of the shareholders' capital stock."

The method of ascertaining the value of capital stock and franchises has been settled for the states in which franchises are taxable. Mr. Justice Miller, in the opinion of the court, in the Illinois State Railroad Tax Cases, said:

"When you have ascertained the current cash value of the whole funded debt and the current cash value of the entire number of shares, you have, by the action of those who, above all others, can best estimate it, ascertained the true value of the road, all its property, its capital stock, and its franchises; for these are all represented by the value of its bonded debt and of the shares of its capital stock." 92 U. S. 575.

The relator did not give before the tax commissioners, and has not given here, evidence upon which the value of its real estate may be determined. Under such circumstances the presumptions which may be indulged and the principles which may be applied are stated in the case of People ex rel. Equitable Gaslight Co. v. Barker, 144 N. Y. 94, 39 N. E. 13. There, as here, the company had a franchise which entitled it to occupy the streets; a more valuable franchise in

proportion, because it had nothing to pay to abutting owners. It had a capital stock of $4,000,000. It was represented to the tax commissioners that its real estate, "as per sworn valuation of the tax commissioners," was of the value of $1,515,400, and that its total personal property was of the value of $1,041,483.43, making the aggregate value of its whole property, real and personal, $2,556,883.43. In the items of its personal property it included patent rights and franchises valued at $500,000. The indebtedness was $2,839,192.98. There, as here, it was made to appear that the debts exceeded the total assets,—in other words, that the relator, as claimed here, was an insolvent corporation; that its capital stock of $4,000,000, paid in and secured to be paid, had been wholly lost, although paying a dividend of 8 per cent. The court reversed the order of the special and general terms, setting aside the assessment, and affirmed the proceedings of the commissioners. Andrews, C. J., for the court, said:

"The computation upon which the commissioners reached the result stated in the corrected assessment roll appears in the return made to the writ. They regarded the capital of $4,000,000 as unimpaired. From this sum they deducted $1,527,300, the assessed value of the real estate, and the further sum of $500,-000, the value of the patents and franchises, which left $1,972,700, the sum which they fixed upon as the portion of the relator's capital, liable to taxation. It will be observed that the assessors made no deduction of the debts from the amount of the capital stock. Debts are deductible in ascertaining the assessable value of the capital of a corporation. But an unimpaired capital implies that there are assets over and above the capital sufficient to pay any outstanding debts, and, if the commissioners had a right to find as they did, that the capital of the relator was unimpaired, they were not bound to deduct the debts, since, presumably, they were offset by assets above the capital which otherwise would have been liable to taxation."

In that case the statement to the assessors contained nothing in terms upon the subject of the value of the relator's real estate; it stated the assessed value only. Here we have the cost only of the structures of the relator, not the value, and no evidence of what it would cost to procure the right of way, or its value, except the amount thus far paid to abutting owners. There is no evidence here to do away with the presumption arising from the possession of an unimpaired capital, except the preposterous valuation put upon the franchise; and therefore, in the absence of evidence of the value of the relator's property, or of facts upon which its value may be estimated, the same presumption may be here indulged as in the Equitable Gaslight Case. If, however, the court is required, upon the evidence here, to put a valuation upon the relator's property for the purpose of assessment, assuming, as I do, that the estimate is to be based upon cost and earning capacity, it may well be found that the capital of the relator subject to taxation, after deducting its indebtedness, equals or exceeds the amount of the assessment. The proceedings of the tax commissioners should be affirmed. An order may be entered dismissing the writ, with costs.

Writ dismissed, with costs.